PILLSBURY WINTHROP SHAW PITTMAN LLP
VERNON H. GRANNEMAN (083532)
 Email:  vernon.granneman@pillsburylaw.com
DIANNE L. SWEENEY (187198)
 Email:  dianne.sweeney@pillsburylaw.com
2475 Hanover Street
Palo Alto, CA  94304-1114
Telephone: (650) 233-4500
Facsimile: (650) 233-4545

Attorneys for Defendant
ENAGRA, INC.

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| ROYAL CARIBBEAN CRUISES LTD., | Case No. C 07-02582 CRB |
| Plaintiff, | **DECLARATION OF MICHAEL PETRAS IN SUPPORT OF ENAGRA, INC.'S MOTION FOR A PROMPT POST-ATTACHMENT HEARING AT WHICH PLAINTIFF IS TO SHOW CAUSE WHY THE ATTACHMENT AS TO ENAGRA, INC. SHOULD NOT BE VACATED** |
| vs. | |
| NATIONAL BIOFUELS, L.P. and ENAGRA, INC., | |
| Defendants. | |
| | Hearing Date: As soon as the Court can schedule a hearing or Tuesday, June 5, 2007 |
| | Time:  TBD |
| | Ctrm:  8, 19th Floor |
| | Judge:  The Hon. Charles R. Breyer |

1      I, Michael Petras, declare as follows:

2      1.    I am the Chief Executive Officer of Enagra, Inc. ("Enagra"), a defendant

3  in the above-referenced action.  For the past three years, I have maintained a permanent

4  residence in Santa Clara County (Los Altos Hills), California.  I have personal

5  knowledge of the matters set forth herein, unless the context indicates otherwise, and, if

6  called as a witness, could and would competently testify thereto.

7      2.    Enagra Inc. is a start-up company formed in California in February 2007.

8  Its business model includes the production and marketing of bio-diesel fuel.  Enagra also,

9  at times, buys and sells fuel.  I am currently the sole officer and shareholder of Enagra.

10      3.    While I separately own and manage Enagra, I am a limited partner of

11  National Biofuels, L.P. ("NBF").  I have also been an employee of NBF and, for quite

12  some time, I have been in the process of exiting NBF, terminating my employment status

13  (which I believe ended as of today) and beginning a new business (Enagra).  I do not now

14  and have never had a controlling interest in NBF.  NBF is managed and controlled by its

15  general partner, National Biofuels LLC ("NBF LLC").  My understanding is that NBF

16  LLC is controlled and managed by Fulcrum Power Services ("Fulcrum").  I have no

17  interest in either NBF LLC or Fulcrum.  As detailed below, neither NBF nor the entities

18  that own/manage NBF have any control or ownership interest in Enagra.  Conversely,

19  Enagra has no ownership of or control over NBF, NBF LLC, or Fulcrum.

20           **ENAGRA HAS AN OFFICE IN SAN FRANCISCO**

21             **AND WAS NOT SERVED IN THIS MATTER**

22      4.    Enagra has a physical office in San Francisco, California, at 381 Bush

23  Street, Suite 300 and has a registered agent for service of process in Sacramento,

24  California.  Enagra's office in San Francisco is staffed and open during regular business

25  hours, and Enagra regularly conducts business there.  Attached hereto as Exhibit A is a

26  true and correct copy of the Commercial Sublease between Enagra and its landlord, SOS,

27  Inc.  Enagra executed this lease in early February 2007 and has occupied that office

28  space since February 2007.  The office is generally occupied by myself and one other

1   employee.  This employee is a manager of the company, has certain authority to sign on

2   behalf of Enagra, and could have accepted service of process for the corporation of any

3   legal documents delivered to Enagra's office if I was not there at the time the process

4   was delivered.  Prior to occupying the space in San Francisco, and while it was

5   formalizing the corporate entity, Enagra listed its corporate counsel's office (Pillsbury

6   Winthrop Shaw Pittman in Palo Alto) as a temporary mailing address in accordance with

7   what I understood to be the usual practice for many new, start-up corporations.[1]

8   Enagra's office in San Francisco is the center of its business operations and it has no

9   other offices.  Enagra's bank account is also located in San Francisco.  In order to keep

10  its business operating expenses low, Enagra uses a VOIP (Voice Over Internet Protocol)

11  telephone system for its San Francisco office.  It is my understanding that our VOIP

12  service is not listed in land-line phone directories as VOIP is not part of that system.

13       5.       To my knowledge, Royal Caribbean Cruises ("RCC") made no attempts

14  to serve Enagra directly or through its agent for service of process.  Attached hereto as

15  Exhibit B is a copy of the information on Enagra's registered agent that is available to the

16  public through the website of the California Secretary of State.  To my knowledge, no

17  attempt was made to serve Enagra's agent for service of process.  Similarly, to my

18  knowledge, no attempt has been made to contact or serve Enagra at its San Francisco

19  office or at any other location.  Finally, at no time has anyone from RCC, including its

20  lawyers, contacted me regarding the claims set forth in RCC's complaint, the attachment,

21  the *ex parte* proceeding or service of process.

22                  **ENAGRA IS NOT MANAGED OR CONTROLLED BY NBF**

23                          **OR ANY NBF RELATED PERSON**

24       6.       Although I have not been served with any documentation in this litigation,

25  I have obtained and reviewed a copy of the verified complaint filed on May 15, 2007 in

26  _____

27  [1]       Enagra will take appropriate steps to update the records with the Secretary of
            State.

28

1  the Northern District of California.  Enagra is not a party to the contract dispute between

2  RCC and NBF and the allegation in the complaint that Enagra is the "alter ego" of NBF

3  is unfounded.  For instance, RCC falsely claims that Enagra is "dominated by" NBF, has

4  "no separate corporate mind", is a "sham entity designed and intended by NBF to defeat

5  NBF's creditors and avoid NBF's liabilities."  Not only are each of these conclusions

6  false but NBF has no ownership, interest or management in Enagra.  Similarly, neither

7  NBF LLC nor Fulcrum have any ownership, interest or management in Enagra.

8       **ENAGRA HAS SOLD FUEL FOR NBF AND OTHER THIRD PARTIES**

9       7.       Over the past months Enagra, in the ordinary course of its business, has

10  bought and sold bio-diesel fuel for various parties.  It has, for example, acted as a trader

11  for certain volumes of fuel in deals with NBF, as well as with other third parties.  With

12  respect to the fuel in dispute in this action, I believe it to be a fungible commodity.  I was

13  further informed at the outset of Enagra's involvement that RCC had defaulted on its

14  agreement to purchase fuel from NBF.  NBF asked Enagra to find a buyer for some of its

15  fuel and I had no reason to believe any of NBF's fuel was owned by or subject to any

16  lien interest of RCC.  Enagra located buyers for a certain amount of fuel and NBF and

17  Enagra entered into an arms length sale agreement at an agreed upon price.  To the best

18  of my knowledge, the buyers that Enagra located and sold the fuel to were not previously

19  customers of NBF.  Attached as Exhibit C are true and correct copies of several bills of

20  lading showing Enagra's sale of the fuel it purchased from NBF to several different

21  customers in Europe.  The documents also list an address for Enagra on Bush Street in

22  San Francisco, California (though incorrectly reciting the street number) and the cell

23  phone number that I regularly use for Enagra business.  I am aware that the cargo

24  manifest contained errors, including misspelling the name of Enagra and providing the

25  wrong address for Enagra (instead of listing the address for the Shipper (Enagra), an

26

27

28

1  address for the underlying seller (NBF) was listed).[2]  I am informed and believe that this

2  error was made by the shipping agent and that both the manifest and the bills of ladings

3  were subsequently corrected.  In all events, Enagra has never had an office in Texas.

4       8.      RCC's allegation that the transaction between Enagra and NBF was

5  without consideration is false.  The transaction between NBF and Enagra was at arms

6  length and, to date, Enagra has paid NBF in excess of $3 million for the fuel that is the

7  basis of NBF's dispute with RCC.  Attached as Exhibit D are true and correct copies

8  (redacted in part) of Enagra's payments to NBF (a cashier's check in the amount of

9  $2,870,698 and a wire payment in the amount of $258,890).  Both of these payments

10  were made in mid-May of this year in accord with Enagra's agreement with NBF and

11  before this action was commenced.  Additional funds will also be paid, in accord with

12  Enagra's agreement with NBF, after Enagra receives payment from its customers.  Those

13  payments constitute fully adequate value under prevailing market rates and there is no

14  basis for RCC to claim otherwise.

15       9.      As detailed herein, Enagra and NBF are entirely separate entities.  Enagra

16  conducts some business with NBF and other third parties.  At no time has Enagra

17  represented itself and NBF as one entity, shared a bank account with NBF (or

18  commingled its funds with NBF funds), or given any special treatment to NBF.  As to

19  Enagra's business with third parties, NBF receives no interest or benefit from Enagra's

20  business.

21       10.     The continuation of the attachment in this matter will severely prejudice

22  Enagra, impacting its banking relationships (which are critical in this business) and its

23  ability to meet third-party obligations and conduct business.  One customer has already

24  expressed serious reservations about continuing to do business while Enagra's assets are

25  tied up by RCC and our bank has advised us that our account in San Francisco is frozen.

26  ────────────────

27  [2]       NBF is based in Texas and has an office in Houston, Texas.  The Houston address
      was incorrectly listed on the cargo manifest (but not on the bills of lading).

28

1      I declare under penalty of perjury that the foregoing is true and correct.  Executed

2 on May 31, 2007, in Palo Alto, California.

3

4                                  Michael Petras

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

      DECL. OF MICHAEL PETRAS ISO MOTION FOR
PROMPT POST-ATTACHMENT HEARING
Case No. C 07-02582 CRB

# EXHIBIT

# A

# COMMERCIAL SUBLEASE

This Sublease is made and entered into this  5  day of Feb 2007 by and between SOS Inc. ("Tenant"), and
Enagra, Inc_ ("Subtenant").

A. Tenant is the lessor of real property situated in the City and County of San Francisco, State of California described as 381 Bush St., #300, San Francisco, CA 94022

B. Tenant desires to sublease a portion of said Property to Subtenant, and Subtenant desires to lease the Property from Tenant, upon the following TERMS and CONDITIONS:

NOW, THEREFORE, for and in consideration of the mutual promises, terms and conditions set forth below, the
parties agree as follows:
(1) Premises. 381 Bush St., #300, San Francisco, CA 94022, consisting of approximately one-half of the office space.

(2) Rental Period - The Rental Period will be for 12 Months beginning on February 1, 2007 and ending on January 31, 2007. The Rental Agreement will continue on a month to month basis thereafter. If the Subtenant for any reason should desire to discontinue these rental arrangements, the Subtenant shall provide 30 days written notice of Rental Termination. Tenant may terminate this Rental arrangement at any time by serving the Subtenant with 30 days written notice to vacate.

(3) Rent. The rent shall be $950 per month. The rent shall be paid in advance on or before the first day of each month during the term of this Lease and shall be deemed late if not received by the Tenant by the third (3rd) day of the month for which that month's rent is due. All rental payments shall be made to the Tenant at 381 Bush St., #300, San Francisco, CA 94022. Tenant grants Subtenant quiet possession of the Property subject to the terms of this Lease.

(3a) Late Payment. Tenant may impose a $100.00 late charge for any late payment of rent. Late payment charges are due and payable with that same month's rent. Any payment of rent by check that is not properly funded shall incur a $50.00 returned check fee, payable to Tenant for each occurrence, plus late charge, if applicable.

(4) Use. Subtenant shall use and occupy the Property for artist studio space and / or offices. All permits and licenses shall be procured at Subtenant's expense. Subtenant shall use the Leased Premises in a careful, safe and proper manner and shall not use or occupy or permit the Leased Premises to be used or occupied for any purpose or in any manner prohibited by the laws of the United States, the State of California, or the ordinances of the City and County of San Francisco.

(5) Care and Maintenance of Premises. Subtenant acknowledges that the Premises and improvements thereon are in good order and repair. Subtenant shall not commit any waste or allow any damage to be committed on any portion of the Leased Premises. Subtenant shall, at its own expense and at all times, maintain the Premises in good and safe condition, including plate glass, electrical wiring, plumbing additions, and heating installations and any other system or equipment upon the Property and shall surrender the same at termination hereof, in as good condition as received. Subtenant shall be responsible for all repairs required. If Tenant shall incur any expense, including reasonable attorney's fees, in instituting, prosecuting or defending any action of Subtenant hereunder, Subtenant shall reimburse Tenant for the amount of such expense with interest at the rate of eighteen percent (18%) per annum from the date of Tenant's advance or advances therefore, which reimbursement and the interest thereon shall be paid within ten (10) days of Tenant's written demand therefor. Subtenant covenants not to introduce any toxic or hazardous material or substance into the Building or onto the Property and shall be fully responsible for the cost of removal and/or remedy of the introduction of any such material or hazardous

material or substance from the Property.

**(6) Alterations.** Tenant must approve in advance any alterations, additions or improvements which Subtenant deems necessary to convert the Premises to the use intended by current structure of the building on the Property. Any such alterations, additions, or improvements shall be at the sole expense of the Subtenant, shall be performed in a first class manner, and shall stay with the Property after the lease term except for movable trade fixtures. Tenant May, by written notice to Subtenant given at least thirty (30) days prior to the end of the term, require Subtenant to remove all such improvements installed by the Subtenant and to repair any damage to the Leased Premises from such removal. Tenant shall have the right to post a notice of non-liability on the Property during construction of any and all Subtenant improvements and/or alterations to the Property. Subtenant shall cause any mechanic's lien claimed against the Property by any person or entity as a result of Subtenant's action to be removed within thirty (30) days of the filing thereof. Subtenant may contest such claimed lien, and shall indemnify and hold Tenant harmless from any claim, demand, liability or obligation therefor, including attorney's fees and costs incurred by Tenant with respect to same.

**(7) Ordinances and Statutes.** Subtenant shall comply with all statutes, ordinances and requirements of all municipal, state and federal authorities now in force, or which may hereafter be in force, pertaining to the Property occasioned by or affecting the use thereof by Subtenant.

**(8) Assignment and Subletting.** Subtenant shall not assign this Lease without the express written consent of Tenant being first obtained therefor. Any such assignment without such consent shall be void and, at the option of the Tenant, Tenant may terminate this Lease. Not withstanding the consent of the Tenant to any such assignment or subletting, the Subtenant shall not be released from its obligations to pay the rent and to perform all other obligations to be performed by Subtenant hereunder for the balance of the term of this Lease and any extension or renewal thereof.

**(9) Utilities.** Utilities are provided by Tenant.

**(10) Entry and Inspection.** Subtenant shall permit Tenant or Tenant's agents to enter upon the Property at reasonable times and upon reasonable notice, for the purpose of inspecting the Property and requiring any necessary repairs thereto.

**(11) Indemnification of Tenant.** Tenant shall not be liable for any damage or injury to Subtenant, or any other person, or to any property, occurring on the Property or any part thereof, and Subtenant agrees to indemnify and hold Tenant harmless from any claims for damages, claims, liabilities, and other obligations, other than those resulting from the gross negligence of the Tenant.

**(12) Insurance.** Subtenant may acquire renters property and liability insurance for their personal and property insurance.

**(13) Tenant's Remedies on Default.** If the Subtenant (i) defaults in the timely payment of rent (ii) defaults in the performance of any of the other covenants or conditions hereof after twenty (20) days prior written notice to the Subtenant thereof, Tenant may give Subtenant notice of default in accordance with law, and Tenant shall have the right, without terminating the Lease, to re-enter and take possession of the Property or any part thereof and repossess the same as of Tenant's former estate, and expel the Subtenant and those claiming through or under the Subtenant, and remove the effect of both or either (forcibly, if necessary) without being deemed guilty in any manner of trespass and without prejudice to any remedies for rent delinquencies or preceding lease defaults. In such event Tenant may from time to time, without terminating

this Lease, relet the Property or any part thereof for such term or terms and at such rental or rentals and upon such other terms and conditions as Tenant may deem advisable, with the right to make alterations and repairs to the Property. Such reentry or taking possession of the Property by Tenant shall not be construed as an election on Tenant's part to terminate this
Lease unless a written notice of termination be given to Subtenant. Such repossession shall not relieve Subtenant of its obligations and liabilities under this Lease, all of which shall survive such repossession, and Subtenant shall pay to Tenant the rent and additional rental and other sums hereinabove provided which would be payable if such repossession had not
occurred, less the net proceeds (if any) of any reletting of the Property after deducting all of Tenant's expenses in connection with such reletting, including but without limitation, all repossession costs, brokerage commissions, legal expenses, attorneys fees, expenses of employees, alteration costs and expenses of preparation for such reletting. Subtenant shall pay such current
damages to Tenant on the days on which the rent would have been payable hereunder if possession had not been retaken, and Tenant shall be entitled to receive the same from Subtenant on each such day.

**(14)** Security Deposit. Tenant will hold $100 Security Deposit from Subtenant to secure payment of rent, and other monetary obligations of the Subtenant which shall be returned to the Subtenant within thirty (30) days after the termination of this Lease less any amounts thereof applied in accordance with law. The security deposit must be paid in full before Subtenant may take possession of stated premises.

**(15)** Subtenant shall not place signs on the Property or building thereon without first obtaining the written consent of Tenant.

**(16)** Waiver. No failure of Tenant or Subtenant to enforce any term hereof, or any delay intaking any action in connection therewith, shall be deemed a waiver.

**(17)** Notices. Any notice which either party may or is required to give, shall be given in writing by hand-delivery or by mailing the same, postage prepaid, to Subtenant at the Property, or Tenant at 381 Bush St., #300, San Francisco, CA 94022
Each party may specify another address by notice given in the same manner.

**(18)** Entire Agreement. The foregoing constitutes the entire agreement between the parties and may be modified only in writing signed by both parties.
In Witness Whereof, the parties have executed this Lease the day and year first above written.

Subtenant:

Michael Petras – Enagra, Inc.


Tenant:

Wade Randlett -

# EXHIBIT

# B

# California Business Portal

**Secretary of State DEBRA BOWEN**

**DISCLAIMER:** The information displayed here is current as of MAY 18, 2007 and is updated weekly. It is not a complete or certified record of the Corporation.

| Corporation | | |
|---|---|---|
| ENAGRA, INC. | | |
| **Number:** C2966239 | **Date Filed:** 2/2/2007 | **Status:** active |
| **Jurisdiction:** California | | |
| **Address** | | |
| 2475 HANOVER STREET | | |
| PALO ALTO, CA 94304-1114 | | |
| **Agent for Service of Process** | | |
| GKL CORPORATE/S EARCH, INC. | | |
| 915 L STREET ST 1250 | | |
| SACRAMENTO, CA 95814 | | |

Blank fields indicate the information is not contained in the computer file.

If the status of the corporation is "Surrender", the agent for service of process is automatically revoked. Please refer to California Corporations Code Section 2114 for information relating to service upon corporations that have surrendered.

# EXHIBIT
# C

Form No. 28 12/1/48
TANKER BILL OF LADING NO.        A1

# ORIGINAL

SHIPPED ON BOARD

G-NNR

Shipped in apparent good order and condition by

**ENAGRA**
301 BUSH ST SUITE 300, SAN FRANCISCO, CA 94104
MIKE PETRAS 650-353-4644

on board the        **"FAIRCHEM STEED"**    Motorship

Whereof    **NEERAJ GARG**        Is Master, at the port of        **LOS ANGELES, CA**

a quantity said to be

| | | |
|---|---|---|
| **1,152.23** | CUBIC METER | |
| | Volume at 15 Celsius (CBM) | |
| **1,006.652** | METRIC TONS (MT) | |
| **304,386.93** | US GALLON | |

**TEMPORARY IMPORTATION BOND # 906-0144711-4**
On board: **17-Apr-07**            Loaded Into Tanks: 1S, 4P, 6S
of    **PME BIODIESEL B99.9**
the quantity, measurement, weight, gauge, quality, nature, value, and condition of the cargo unknown to the
Vessel and the Master.
to be delivered at the port of **ROTTERDAM**    or near thereto as the Vessel

can safely get, always afloat, unto    **THE ORDER OF NATIXIS BANQUES POPULAIRES**
**45, RUE SAINT DOMINIQUE, 75007 PARIS, FRANCE**
**ATTN: BRIGITTE POGGI TEL: 0033 158194405**

Notify:    **VERTICAL UK LLP**
**5 LLOYD'S AVENUE, LONDON EC3N 3AE, UNITED KINGDOM**
**BUYER'S REP: HENRI J. BARDON (65) 9169 1388**

**NO SED REQUIRED AES ITN : X20070413060916**
or order on payment of freight at the rate of    **PAYABLE AS PER CHARTER PARTY**

> This shipment of 1,006.652 Metric tons was loaded on board the Vessel as part of one original lot of 3,111.739 Metric tons stowed in 1S, 4P, 6S with no segregation as to parcels. For the whole shipment sets of Bill of Lading have been issued for which the Vessel is relieved from all responsibilities to the extent it would be if one set only would have been issued. The Vessel undertakes to deliver only that portion of the cargo actually boded which is represented by the percentage that the total amount specified in the Bill(s) of Lading bears to the total of the commingling shipment delivered at destination. Neither the Vessel nor the owners assume any responsibility for the consequences of such commingling nor for the separation thereof at the time of delivery.

This shipment is carried under and pursuant to the terms of the Governing Charter Party    **DATED MARCH 28, 2007**

at _____ between    **ALLIED CHEMICAL CARRIERS LLC** _____

and    **NATIONAL BIOFUELS LLP** _____    as Charterer, and all the terms
whatsoever of the the said Charter except the rate and payment of freight specified therein apply to and govern the
rights of the parties concerned in this shipment.

If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved
April 16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain
Rules relating to Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge
being territory in which the said Act or other similar legislation is in force, this Bill of Lading shall have effect subject
to the provisions of the said Act or other similar legislation, as the case may be, which shall be deemed incorporated
herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or
an increase of any of its responsibilities or liabilities under said Act or other similar legislation. If any term of this Bill
of Lading is repugnant to the said Act or other similar legislation as so incorporated, such terms shall be void but not
to that extent but no further.

These commodities are licensed by the U.S. for ultimate destination FAR EAST
Diversion contrary to the U.S. Law is prohibited.

In Witness Whereof, the Master has signed THREE (3) ORIGINAL Bills of Lading of this tenor and date, one of
which being accomplished, the others will be void.

Dated at    **LOS ANGELES, CA** _____    this    **20th** ____    day of    **APRIL 2007** _____

FOR AND ON BEHALF OF MASTER / M/T **"FAIRCHEM STEED"**
TRANSMARINE NAVIGATION CORPORATION
AS AGENTS ONLY

Form No. 28 12/1/48
TANKER BILL OF LADING NO.        A2

# ORIGINAL

SHIPPED ON BOARD

G-NNR

Shipped in apparent good order and condition by

ENAGRA
301 BUSH ST SUITE 300, SAN FRANCISCO, CA 94104
MIKE PETRAS 650-353-4644

on board the        "FAIRCHEM STEED"    Motorship

Whereof    **NEERAJ GARG**        is Master, at the port of    **LOS ANGELES, CA**

a quantity said to be

| | | |
|---|---|---|
| 2,409.52 | CUBIC METER | |
| | Volume at 15 Celsius (CBM) | |
| 2,105.087 | METRIC TONS (MT) | |
| 636,526.89 | US GALLON | |

On board: **17-Apr-07**        Loaded into Tanks: 1S, 4P, 6S
of        PME BIODIESEL B99.9
the quantity, measurement, weight, gauge, quality, nature, value, and condition of the cargo unknown to the
Vessel and the Master.
to be delivered at the port of   ROTTERDAM   or near thereto as the Vessel

can safely get, always afloat, unto    THE ORDER OF NATIXIS BANQUES POPULAIRES
45, RUE SAINT DOMINIQUE, 75007 PARIS, FRANCE
ATTN: BRIGITTE POGGI TEL: 0033 158194405

Notify:    VERTICAL UK LLP
5 LLOYD'S AVENUE, LONDON EC3N 3AE, UNITED KINGDOM
BUYER'S REP; HENRI J. BARDON (65) 9189 1388

NO SED REQUIRED AES ITN : X20070413060916
or order on payment of freight at the rate of    PAYABLE AS PER CHARTER PARTY

---

This shipment of 2,105.087 Metric tons was loaded on board the Vessel as part of one original lot of 3,111.739 Metric tons stowed in 1S, 4P, and 6S with no segregation as to parcels. For the whole shipment sets of Bill of Lading have been issued for which the Vessel is relieved from all responsibilities to the extent it would be if one set only would have been issued. The Vessel undertakes to deliver only that portion of the cargo actually boded which is represented by the percentage that the total amount specified in the Bill(s) of Lading bears to the total of the commingling shipment delivered at destination. Neither the Vessel nor the owners assume any responsibility for the consequences of such commingling nor for the separation thereof at the time of delivery.

---

This shipment is carried under and pursuant to the terms of the Governing Charter Party    DATED MARCH 28, 2007

at _____ between    **ALLIED CHEMICAL CARRIERS LLC**

and    **NATIONAL BIOFUELS LLP**    as Charterer, and all the terms
whatsoever of the said Charter except the rate and payment of freight specified therein apply to and govern the
rights of the parties concerned in this shipment.

If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved
April 16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain
Rules relating to Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge
being territory in which the said Act or other similar legislation is in force, this Bill of Lading shall have effect subject
to the provisions of the said Act or other similar legislation, as the case may be, which shall be deemed incorporated
herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or
an increase of any of its responsibilities or liabilities under said Act or other similar legislation. If any term of this Bill
of Lading is repugnant to the said Act or other similar legislation as so incorporated, such terms shall be void to that
extent but no further.

These commodities are licensed by the U.S. for ultimate destination FAR EAST
Diversion contrary to the U.S. Law is prohibited.

In Witness Whereof, the Master has signed THREE (3) ORIGINAL Bills of Lading of this tenor and date, one of
which being accomplished, the others will be void.

Dated at    **LOS ANGELES, CA**    this _____ **20th** _____ day of    **APRIL 2007**

FOR AND ON BEHALF OF MASTER / M/T "FAIRCHEM STEED"
TRANSMARINE NAVIGATION CORPORATION
AS AGENTS ONLY

Form No. 28 12/1/48
TANKER BILL OF LADING NO.          A3

# ORIGINAL

**SHIPPED ON BOARD**

G-NNR

Shipped in apparent good order and condition by

**ENAGRA**
**301 BUSH ST SUITE 300, SAN FRANCISCO, CA 94104**
**MIKE PETRAS 650-353-4644**

on board the          "FAIRCHEM STEED"    Motorship

Whereof    **NEERAJ GARG**          is Master, at the port of          **LOS ANGELES, CA**

a quantity said to be

| | |
|---|---|
| **11,104.49** | BARRELS AT 60 DEG F |
| **1,518.053** | LONG TONS |
| **1,542.415** | METRIC TONS |

On board: **17-Apr-07**          Loaded Into Tanks:  6P, 3S

of          **PALM METHYL ESTERS**
the quantity, measurement, weight, gauge, quality, nature, value, and condition of the cargo unknown to the
Vessel and the Master.
to be delivered at the port of    **ROTTERDAM**    or near thereto as the Vessel

can safely get, always afloat, unto          **GLENCORE GRAIN B.V.**
**"COOLSEPOORT" COOLSINGEL 139, 3012AG ROTTERDAM**

Notify:    **N/A**
                                              **NO SED REQUIRED  AES ITN : X20070413060923**
or order on payment of freight at the rate of    **PAYABLE AS PER CHARTER PARTY**

This shipment is carried under and pursuant to the terms of the Governing Charter Party          **DATED MARCH 28, 2007**

at _____  between          **ALLIED CHEMICAL CARRIERS LLC**

and    **NATIONAL BIOFUELS LLP**    as Charterer, and all the terms
whatsoever of the the said Charter except the rate and payment of freight specified therein apply to and govern the
rights of the parties concerned in this shipment.

If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved
April 16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain
Rules relating to Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge
being territory in which the said Act or other similar legislation is in force, this Bill of Lading shall have effect subject
to the provisions of the said Act or other similar legislation, as the case may be, which shall be deemed incorporated
herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or
an increase of any of its responsibilities or liabilities under said Act or other similar legislation.  If any term of this Bill
of Lading is repugnant to the said Act or other similar legislation as so incorporated, such terms shall be void to that
extent but no further.

These commodities are licensed by the U.S. for ultimate destination FAR EAST
Diversion contrary to the U.S. Law is prohibited.

In Witness Whereof, the Master has signed THREE (3) ORIGINAL Bills of Lading of this tenor and date, one of
which being accomplished, the others will be void.

Dated at    **LOS ANGELES, CA** _____      this _____  **20th** _____  day of    **APRIL 2007**

FOR AND ON BEHALF OF MASTER / **M/T "FAIRCHEM STEED"**
TRANSMARINE NAVIGATION CORPORATION
AS AGENTS ONLY

Form No. 28 12/1/48
TANKER BILL OF LADING NO.          A4

**ORIGINAL**

**SHIPPED ON BOARD**

G-NNR

Shipped in apparent good order and condition by

**ENAGRA**
**301 BUSH ST SUITE 300, SAN FRANCISCO, CA 94104**
**MIKE PETRAS 650-353-4644**

on board the          **"FAIRCHEM STEED"**     Motorship

Whereof     **NEERAJ GARG**          is Master, at the port of          **LOS ANGELES, CA**

a quantity said to be

|  |  |
|---|---|
| 30,552.90 | BARRELS AT 60 DEG F |
| 4,176.773 | LONG TONS |
| 4,243.803 | METRIC TONS |

TEMPORARY IMPORTATION BOND #906-0144767-6
On board: 17-Apr-07          Loaded into Tanks:  2-P, 2-S, 7-P, 7-S, 8-P, 9-S, 10-P, 10-S
of          **FATTY ACID METHYL ESTER PME EN 14214**
the quantity, measurement, weight, gauge, quality, nature, value, and condition of the cargo unknown to the
Vessel and the Master.
to be delivered at the port of  **AMSTERDAM, THE NETHERLANDS**   or near thereto as the Vessel

can safely get, always afloat, unto     **ED&F MANN LIQUID PRODUCTS LTD**
**COTTON CENTRE, HAY'S LANE, LONDON SE1 2QE, UNITED KINGDOM**
**ATTN: HAMISH FRASER 44 20 70898321**

Notify:     **ED&F MANN LIQUID PRODUCTS LTD, COTTON CENTRE, HAY'S LANE, LONDON SE1 2QE, UNITED KINGDOM**
**ATTN: HAMISH FRASER 44 20 70898321**
or order on payment of freight at the rate of     **PAYABLE AS PER CHARTER PARTY**
**NO SED REQUIRED AES ITN : X20070413060919**

This shipment of 4,243.803 Metric tons was loaded on board the Vessel as part of one original lot of 6,758.098 Metric tons stowed in 2
P, 2-S, 7-P, 7-S, 8-P, 9-S, 10-P, and 10-S with no segregation as to parcels. For the whole shipment sets of Bill of Lading have been
issued for which the Vessel is relieved from all responsibilities to the extent it would be if one set only would have been issued. The
Vessel undertakes to deliver only that portion of the cargo actually landed which is represented by the percentage that the total
amount specified in the Bill(s) of Lading bears to the total of the commingling shipment delivered at destination. Neither the Vessel nor
the owners assume any responsibility for the consequences of such commingling nor for the separation thereof at the time of delivery.

This shipment is carried under and pursuant to the terms of the Governing Charter Party          DATED MARCH 28, 2007

at _____     between     **ALLIED CHEMICAL CARRIERS LLC** _____

and     **NATIONAL BIOFUELS LLP** _____     as Charterer, and all the terms
whatsoever of the said Charter except the rate and payment of freight specified therein apply to and govern the
rights of the parties concerned in this shipment.

If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved
April 16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain
Rules relating to Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge
being territory in which the said Act or other similar legislation is in force, this Bill of Lading shall have effect subject
to the provisions of the said Act or other similar legislation, as the case may be, which shall be deemed incorporated
herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or
an increase of any of its responsibilities or liabilities under said Act or other similar legislation. If any term of this Bill
of Lading is repugnant to the said Act or other similar legislation as so incorporated, such terms shall be void to that
extent but no further.

These commodities are licensed by the U.S. for ultimate destination FAR EAST
Diversion contrary to the U.S. Law is prohibited.

In Witness Whereof, the Master has signed THREE (3) ORIGINAL Bills of Lading of this tenor and date, one of
which being accomplished, the others will be void.

Dated at     **LOS ANGELES, CA** _____     this ____ 20th ____ day of ____ **APRIL 2007** ____

FOR AND ON BEHALF OF MASTER / M/T "FAIRCHEM STEED"
TRANSMARINE NAVIGATION CORPORATION
AS AGENTS ONLY

ORIGINAL

Form No. 28 12/1/48
TANKER BILL OF LADING NO.          A5

SHIPPED ON BOARD

G-NNR

Shipped in apparent good order and condition by

**ENAGRA**
**301 BUSH ST SUITE 300, SAN FRANCISCO, CA 94104**
**MIKE PETRAS 650-353-4644**

on board the          "FAIRCHEM STEED"    Motorship

Whereof    **NEERAJ GARG**                is Master, at the port of          **LOS ANGELES, CA**

a quantity said to be

|  |  |
|---|---|
| **18,101.46** | BARRELS AT 60 DEG F |
| **2,474.583** | LONG TONS |
| **2,514.295** | METRIC TONS |

On board: **17-Apr-07**              Loaded into Tanks: 2-P, 2-S, 7-P, 7-S, 8-P, 9-S, 10-P, 10-S
of        **FATTY ACID METHYL ESTER PME EN 14214**
the quantity, measurement, weight, gauge, quality, nature, value, and condition of the cargo unknown to the
Vessel and the Master.
to be delivered at the port of  **AMSTERDAM, THE NETHERLANDS**   or near thereto as the Vessel

can safely get, always afloat, unto        **ED&F MANN LIQUID PRODUCTS LTD**
**COTTON CENTRE, HAY'S LANE, LONDON SE1 2QE, UNITED KINGDOM**
**ATTN: HAMISH FRASER 44 20 70898321**

Notify:      **ED&F MANN LIQUID PRODUCTS LTD, COTTON CENTRE, HAY'S LANE, LONDON SE1 2QE, UNITED KINGDOM**
**ATTN: HAMISH FRASER 44 20 70898321**
or order on payment of freight at the rate of      **PAYABLE AS PER CHARTER PARTY**
**NO SED REQUIRED AES ITN : X20070413060919**

---
This shipment of 2,514.295 Metric tons was loaded on board the Vessel as part of one original lot of 6,758.098 Metric tons stowed in 2
P, 2-S, 7-P, 7-S, 8-P, 9-S, 10-P, and 10-S with no segregation as to parcels. For the whole shipment sets of Bill of Lading have been
issued for which the Vessel is relieved from all responsibilities to the extent it would be if one set only would have been issued. The
    Vessel undertakes to deliver only that portion of the cargo actually loaded which is represented by the percentage that the total
amount specified in the Bill(s) of Lading bears to the total of the commingling shipment delivered at destination. Neither the Vessel nor
the owners assume any responsibility for the consequences of such commingling nor for the separation thereof at the time of delivery.
---

This shipment is carried under and pursuant to the terms of the Governing Charter Party          **DATED MARCH 28, 2007**

at        _____    between      **ALLIED CHEMICAL CARRIERS LLC**

and      **NATIONAL BIOFUELS LLP**      as Charterer, and all the terms
whatsoever of the the said Charter except the rate and payment of freight specified therein apply to and govern the
rights of the parties concerned in this shipment.

If this Bill of Lading is a document of title to which the Carriage of Goods by Sea Act of the United States, approved
April 16, 1936, or similar legislation giving statutory effect to the International Convention for the Unification of Certain
Rules relating to Bills of Lading at Brussels of August 25, 1924, applies by reason of the port of loading or discharge
being territory in which the said Act or other similar legislation is in force, this Bill of Lading shall have effect subject
to the provisions of the said Act or other similar legislation, as the case may be, which shall be deemed incorporated
herein, and nothing herein contained shall be deemed a surrender by the carrier of any of its rights or immunities or
an increase of any of its responsibilities or liabilities under said Act or other similar legislation.  If any term of this Bill
of Lading is repugnant to the said Act or other similar legislation as so incorporated, such terms shall be void to that
extent but no further.

These commodities are licensed by the U.S. for ultimate destination FAR EAST
Diversion contrary to the U.S. Law is prohibited.

In Witness Whereof, the Master has signed THREE (3) ORIGINAL Bills of Lading of this tenor and date, one of
which being accomplished, the others will be void.

Dated at    **LOS ANGELES, CA** _____    this    **20th**    day of    **APRIL 2007**

FOR AND ON BEHALF OF MASTER / M/T "FAIRCHEM STEED"
TRANSMARINE NAVIGATION CORPORATION
AS AGENTS ONLY

# EXHIBIT
# D

# citibank
Citibank, N.A.

## OFFICIAL CHECK

**SERVICE INSTRUCTIONS**
PLEASE CONSULT A CITIBANK ASSOCIATE OR YOUR CLIENT MANUAL FOR A
DESCRIPTION OF THE BANK'S POLICY CONCERNING PLACING A STOP PAYMENT
REQUEST ON THIS INSTRUMENT AND THE FEE ASSOCIATED WITH THAT REQUEST.

924056352

16-2958
1220

FOR YOUR PROTECTION SAVE THIS COPY

REMITTER COPY

**NON NEGOTIABLE**

**TERMS**
KEEP THIS COPY FOR YOUR RECORD OF THE TRANSACTION. TO REPORT A LOSS OR FOR ANY OTHER INFORMATION
ABOUT THE INSTRUMENT, CONTACT THE INSTITUTION FROM WHICH YOU RECEIVED THE INSTRUMENT.

Citibank: CitiBusiness Online                                    https://citibusinessonline.da-us.citibank.com/cbusol/start.do



**CitiBusiness®**                                    🖶 **Print**

Today: 05/29/2007
Business: 7000000000243526

| Quick Jump To Menu | ▾ |

**Main Menu**   **Customer Service**   **Help Desk**   **Approvals**   **Open An Account**   **Quit / Sign off**

Main Menu > Transfers and Payments >                                    Help

# COMPLETED WIRES

| Here is the wire information: | |
|---|---|
| Setup By: | MIKE PETRAS |
| Date: | May 13, 2007 |
| Reference #: | G0071341403601 |
| Amount: | $258,890.00 |
| Source Account: | **REDACTED** |
| Beneficiary Name: | NATIONAL BIOFUELS LP |
| Address: | 5120 Woodway #10010 Houston TX 77056 |
| Phone: | 713-297-4522 |
| Bank Name: | CHASE BANK OF TEXAS |
| Bank ABA#: | 113000609 |
| Branch Address: | |
| Branch City: | HOUSTON |
| State: | TX |
| NATIONAL BIOFUELS LP's account at CHASE BANK OF TEXAS: | **REDACTED** |
| Special Instructions (Invoice#, Purchase Order#, etc.): | |

◀ **Back**

1 of 2                                                                    5/29/07 1:03 PM